## Gary Sagar v. Warren Selectboard

[744 A.2d 422]

No. 98-190

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed November 24, 1999

*Peter S. Sidel* of *Sidel & Pikulski,* Waitsfield, for Plaintiff-Appellant.

*Glenn C. Howland* of *McKee, Giuliani & Cleveland, P.C.,* Montpelier, for Defendant-Appellee.

**Dooley, J.** Plaintiff Gary Sagar brought suit in the Washington Superior Court, seeking an order directing the selectboard in the Town of Warren to plow a class 2 town highway to a point that would give him year-round access to property he owns on the road. The highway in question is the Lincoln Gap Road, a mountainous roadway that connects Warren with the Town of Lincoln and points west. The superior court entered judgment in favor of the Town, concluding that any decision on whether to plow the road is within the discretionary authority vested by statute in the selectboard. We sustain plaintiff's appeal, vacate the judgment of the superior court and remand for further proceedings.

The case never proceeded beyond the pleadings. The complaint contains the following allegations: Plaintiff is a resident of Massachusetts who owns a parcel of land on the Lincoln Gap Road in Warren. In 1985, the Warren selectboard approved a road cut that would allow him to gain access to the property from the road. At the time approval was granted, the Town was regularly plowing the road to a point beyond the road cut to reach a safe turnaround point for the plow. Plaintiff received assurances that the Town would continue to plow the road to a point beyond the road cut. Some years later, desiring to construct two single-family homes on his property, plaintiff sought permission for a second road cut several hundred feet below the one previously approved. In July 1996, the selectboard tabled plaintiff's request for the second road cut and decided to discontinue plowing the road to the existing one. These decisions resulted in this litigation.

The Lincoln Gap Road is a class 2 highway under the classification scheme for town highways set forth in 19 V.S.A. § 302. Under this

classification system, class 2 town highways "are those town highways selected as the most important highways in each town." 19 V.S.A. § 302(a)(2). Class 2 highways are "selected with the purposes of securing trunk lines of improved highways from town to town and to places which by their nature have more than normal amount of traffic." *Id.*

The Town argued to the superior court that the selectboard has discretion in deciding how to maintain roads, and it had exercised its discretion to keep most of the Lincoln Gap Road closed and unplowed during the winter months. It filed a motion to dismiss, or alternatively a motion for summary judgment, which put before the court the minutes of the various meetings of the selectboard that dealt with the plaintiff's road cut application. These minutes disclosed that the Town has plowed only part of the Lincoln Gap Road, leaving most of it impassible during the winter months. In response to plaintiff's application, the selectboard decided that the point to which the road had been plowed created safety concerns for the plow operators and that henceforth the Town would plow only to a point short of the plaintiff's land.[1] The selectboard denied the road cut application because there would be no winter access through the proposed road cut.

The Town relies primarily on the selectboard's "general supervision and control" over town highways, 19 V.S.A. § 303, and the statutory expression of their responsibility:

> [S]ee that town highways and bridges are properly laid out, constructed, maintained, altered, widened, vacated, discontinued and operated, when the safety of the public requires, in accordance with the provisions of this title.

*Id.* § 304(a)(1). It argues that the selectboard's responsibilities under any of the statutory sections on highways are subject to the proviso "when the safety of the public requires," and the selectboard properly determined that the safety of the public, including those who would plow the road, requires that the road remain closed in the winter.

---

[1] The dissent relies on the fact that the Lincoln Gap Road has not been plowed for fifty years, a fact not supported in the record. What this record does show is that the portion of the road in issue was routinely plowed by the Town up to the time of plaintiff's request for a road cut. The Town chose to defend this litigation on its asserted power to close any part of the road by refusing to plow it. As a result, we have addressed this general assertion of power in the way it was presented to us. This case remains, however, a dispute over a section of the road which the Town has previously plowed.

Further, it argues that this decision lies within the discretion of the selectboard and cannot be reviewed by the court.

The plaintiff responds that a class 2 town road must at least meet the standards for a class 3 town road, which include that it be "negotiable under normal conditions all seasons of the year by a standard manufactured pleasure car," and that it have "sufficient width capable to provide winter maintenance." 19 V.S.A. § 302(a)(3)(B). The plaintiff reiterates that the Town has the responsibility to keep highways "in good and sufficient repair during all seasons of the year." *Id.* § 310(a); see also *id.* § 971 (if highway is "out of repair or unsafe for travel," any three citizens or taxpayers in the state may give written notice to the selectboard, and, if the town fails to respond, complain to the county road commissioner or the superior court); *id.* § 991 (when a town "liable to keep in repair a highway . . . fails to do so," it may be indicted and fined by the court). Plaintiff argues that under these sections, the Town has no discretion to refuse to plow the road as long as it remains a class 2 road.

The superior court generally accepted the Town's argument, concluding that none of the statutes clearly require that the selectboard plow any road, and "the statute strongly suggests it is discretionary, and common experience supports the conclusion that local authorities must have substantial discretion in the expenditure of not inconsiderable funds." It awarded judgment for the Town because "snowplowing is not mandated."

Before we reach the merits, we clarify the procedural state of the case. The superior court decided the case on the Town's motion for judgment on the pleadings or, in the alternative, for summary judgment. Although the court did not specify whether it was deciding the case under V.R.C.P. 12(c) (judgment on the pleadings) or V.R.C.P. 56 (summary judgment), we assume the court invoked the former because the Town submitted with its motion neither any supporting materials nor the statement of materials facts that are required under V.R.C.P. 56. See *Reynolds v. Sullivan*, 136 Vt. 1, 3, 383 A.2d 609, 611 (1978) (summary judgment motion relying solely on pleadings "is functionally the same as" a motion for judgment on pleadings under Rule 12(c)). In reviewing a V.R.C.P. 12 motion, we must assume as true all well-pleaded factual allegations in the nonmovant's pleadings and all reasonable inferences that can be drawn from them. See *Hopper v. Kelz*, 166 Vt. 616, 616, 694 A.2d 415, 415 (1997) (mem.). "[A]ny contravening assertions in the movant's pleadings are taken to be false." *Id.*

We also emphasize that this is a petition for mandamus. Generally, the purpose of mandamus is to require a public officer to perform a simple and definite ministerial duty imposed by law. See *Vermont State Employees' Ass'n v. Vermont Criminal Justice Training Council*, 167 Vt. 191, 195, 704 A.2d 769, 771 (1997). Thus, mandamus ordinarily is not available to compel discretionary decisions. See *id*. There is, however, an exception: "Where there appears, in some form, an arbitrary abuse of the power vested by law in an administrative officer . . . which amounts to a virtual refusal to act or to perform a duty imposed by law, mandamus may be resorted to in the absence of other adequate legal remedy."[2] *Richardson v. City of Rutland*, 164 Vt. 422, 424, 671 A.2d 1245, 1247 (1995) (quoting *Couture v. Selectmen of Berkshire*, 121 Vt. 359, 361, 159 A.2d 78, 80 (1960)) (internal quotation marks omitted). We have held that mandamus may be available to enforce a town's duty to keep a highway in good and sufficient repair at all seasons of the year. See *Ellis v. Cannon*, 113 Vt. 511, 516, 37 A.2d 377, 380 (1944). Because of the nature of the remedy, however, it is not enough for the plaintiff to show that the selectboard abused its discretion. He must show the board had no discretion or that its failure to act was an "arbitrary abuse of power."

The duties of the Town with respect to roads are entirely statutory. If the plaintiff is entitled to relief, we must find that entitlement in the statutory scheme. See *id*. at 513-14, 37 A.2d at 379.

In construing a statute, our objective is to implement the intent of the Legislature. See *In re P.S.*, 167 Vt. 63, 70, 702 A.2d 98, 102 (1997). We look to the "whole of the statute and every part of it, its subject matter, the effect and consequences, and the reason and spirit of the law." *Id*. Of course if the statute is unambiguous and the words have a plain meaning, we apply that meaning. See *id*.

As the superior court noted, none of the statutes explicitly dictate that the Town must plow its roads. Phrases like "general supervision and control" and "see that town highways are properly . . . maintained" are ambiguous in the sense that their plain and ordinary meaning does not resolve the question of whether a town may decide

---

[2] Mandamus is not available if another adequate remedy is available. See *Fenwick v. City of Burlington*, 167 Vt. 425, 433, 708 A.2d 561, 566 (1997) (quoting *In re Fairchild*, 159 Vt. 125, 130, 616 A.2d 228, 231 (1992)). The Town has not argued that another remedy is available here. As a result, we have not considered the availability of other remedies.

not to plow a class 2 highway. We must therefore look elsewhere in the statutes. Legislative history may also shed light in these circumstances. See *In re Margaret Susan P.*, 169 Vt. 252, 262, 733 A.2d 38, 46 (1999) (recourse to legislative history appropriate when statute is "unclear and ambiguous").

Plaintiff relies primarily on the legislative classification system contained in 19 V.S.A. § 302 and its requirement that class 3 roads be "negotiable . . . all seasons of the year by a standard manufactured pleasure car." 19 V.S.A. § 302(a)(3)(B). The legislative history indicates that the classification system was introduced in 1973 to clarify the system of state aid to local highways. 1973, No. 63, § 5 (amending 19 V.S.A. § 17).[3] Prior to the 1973 modification, the major town roads were classified as state aid highways and town highways. The former were the most important highways of the town, and became the class 2 highways under the 1973 system. See *id.* § 19(a)(2). The latter became class 3 highways under the 1973 system. See *id.* § 19(a)(3).

Under the pre-1973 system, towns were required to keep state aid highways "in good repair at all seasons of the year." 1957, No. 250, § 14. This did not necessarily mean that towns were required by this statute to plow all state aid highways. In 1927, the Legislature created a special fund "to assist towns in the maintenance of snow or winter roads for motor vehicle traffic." 1927, No. 65, § 1. State aid became available to a town or village that "desire[d] to keep a part or all of its selected highways open for motor vehicle traffic during the winter season." *Id.* § 2. By 1933, the authorization applied only to state aid highways, 1933 P.L. § 4682, and necessarily implied that a town could decide *not* to keep a state aid highway open for motor vehicle traffic during the winter season despite its obligation to keep such highway "in good repair at all seasons of the year," 1933 P.L. § 4657. The Legislature apparently accepted the proposition that a highway could be in good repair in the winter even if not maintained by snowplowing and passable at all times.

In 1957, as part of a comprehensive rewrite of the highway statute, the Legislature repealed the special funding authorization for winter maintenance of state aid highways and allowed towns to use their normal state aid funding to cover up to half the cost of such maintenance. See 1957, No. 250, §§ 18, 48. This amendment did not

---

[3] As discussed *infra*, the road classification system was recodified since 1973 so that the former 19 V.S.A. § 17 is now 19 V.S.A. § 302. There has been no significant modification of the language in the recodification.

resolve the tension between the general statement of the town's obligation with respect to state aid highways and its obligation for winter maintenance of those roads. We assume that towns continued not to plow some state aid roads.

The 1973 revision did intend to address this tension. The revision started as the report of a special study commission, the recommendations of which were introduced as S. 37 of the 1973 session of the Legislature. See S. 37, 1973 Sess. (Vt. 1973); Vermont Commission on an Integrated Highway System, *Report of Recommendations* (1972). The commission report indicated that funding of state aid highways was based, in part, on local designations, and this resulted in funding for roads that were "obviously untraveled and impassable." Hearing on S. 37 and H. 132 before the Senate Highways and Bridges Committee and the House Highways Committee, Jan. 25, 1973, at 3 (Statement of Senator Wesphal on behalf of Commission on an Integrated Highway System). It proposed correcting the problem by requiring state highway board involvement in the certification of eligible roads. See *id.* at 3-4. Senator Wesphal, a sponsor of the bill, described the solution: "a town should be paid for those roads that they are maintaining, but they do not deserve to receive state money for roads they are obviously not maintaining." *Id.* at 3. The chairman of the Senate Highway and Bridges Committee, Senator O'Brien, explained that under the bill, the state aid money would go for roads that "are passable year round." *Id.* at 4. The provisions addressing this issue remained intact as S. 37 went through the legislative process and was enacted into law.

■ We draw from the legislative history in concluding that by adopting the current classification system in 19 V.S.A. § 302, the Legislature intended state aid to be available only for roads that are maintained and passable during all parts of the year. This was a fundamental change because, as discussed above, there had been no such requirement even for state aid highways, the more important of the town highways for which towns received state assistance. For purposes of this litigation, the history provides two key elements of legislative intent. First, the specific standard for class 3 highways, that they be "negotiable under normal conditions all seasons of the year by a standard manufactured pleasure car," applies equally to class 2 roads, because the towns receive state aid for these roads. This requirement is implied in the fact that class 2 roads are more "important" than class 3 roads, and has not been contested by the Town in this case.

■ Second, the legislative performance standard also includes the requirement that a town maintain class 2 and 3 highways to make them "negotiable under normal conditions all seasons of the year." In short, a town is generally required to plow class 2 and 3 roads during the winter to make them passable.

Plaintiff also relies on 19 V.S.A. § 310(a) and its requirement that towns keep class 2 and 3 highways "in good and sufficient repair during all seasons of the year." This section has a very different history from § 302, the classification statute. With some variations in language, this statute has been in our highway law since the early nineteenth century. See 1840 R.S. ch. 21, § 1 (highways "shall be kept in good and sufficient repair at the expense of the town, at all seasons of the year"). It is one of four, now three, basic statutes that have been in our law over most of that period to define the responsibilities of towns for the upkeep of roads and the consequence of failure to meet those responsibilities. The other two existing statutes provide (1) for criminal liability of a town which "liable to keep in repair a highway . . . fails to do so," 19 V.S.A. § 991; see also 1840 R.S. ch. 21, § 30, and (2) relief through county road commissioners and the superior court when a highway "is out of repair or unsafe for travel." 19 V.S.A. § 971; see also 1840 R.L. § 3101. The fourth statute, now narrowed to apply only to bridges and culverts, allowed individuals to sue towns for damages caused by "insufficiency or want of repair" of a highway the town is obligated to keep in repair. 19 V.S.A. § 985(a); see also 1840 R.S. ch. 21, § 26. These statutes all deal with aspects of the same subject and must be viewed in pari materia. See *Robes v. Town of Hartford*, 161 Vt. 187, 192, 636 A.2d 342, 346 (1993) (provisions part of the same statutory scheme must be read in pari materia); see also *Moody v. Town of Bristol*, 71 Vt. 473, 475, 45 A. 1038, 1038 (1899) (statutes create duty on towns "to keep their highways and bridges reasonably safe for travel thereon"). Although there are some variations in language, we conclude that they define a town's responsibility and the various remedies for breach of that responsibility.

In a series of early cases, this Court defined the nature of a town's responsibility for upkeep of roads, generally in response to private damage suits filed when a private remedy was allowed. In a case in which a traveler was injured on private land because the road was impassable as a result of a washout, we described the town's duty as follows:

> It was the duty of the town to keep the road in good and sufficient repair at all seasons of the year . . . .

> . . . Snow and ice are temporary in their character, although often uncomfortably permanent in their duration. So washouts that impede and obstruct travel may justly be deemed to be temporary; for it is the duty of towns to make them so, and the common course that they are.

*Morey v. Fitzgerald*, 56 Vt. 487, 491 (1884). Consistent with this expression of duty, a number of cases under the statute dealt with instances where travelers were injured because of ice and snow conditions on the road. For example, in *Green v. Town of Danby*, 12 Vt. 338, 341 (1840), the main path of a road was blocked by snow drifts, which had existed for four to six weeks, so that travelers were trying to proceed along a ditch on the side of the road. When the plaintiff tried to get around the drift in a sleigh, the sleigh tipped over, and plaintiff was injured. This Court affirmed a verdict for plaintiff, holding that the facts showed that the road was "insufficient and out of repair" and the town was guilty of the "most gross neglect" for not clearing the road. *Id.*; see also *Barton v. Town of Montpelier*, 30 Vt. 650, 653 (1858) (town liable for not cutting a road of adequate width through snow drift).

■ Although § 310(a) provides a duty only of "repair," we conclude that this duty has historically been viewed broadly enough to include what may be better termed as maintenance. In any event, it includes the duty to remove snow to make roads passable. Even in the early nineteenth century when snow removal was more difficult than it is today, this Court found that a road was insufficient and not in good repair when it was so blocked with snow that it was impassable for the method of transportation of the time.

The Town relies primarily on the selectboard's broad authority to manage town affairs, see *Hansen v. Town of Charleston*, 157 Vt. 329, 335, 597 A.2d 321, 324 (1991), and its power of "general supervision and control" over town highways, 19 V.S.A. § 303. It argues that the exercise of these powers is discretionary, "to be exercised or withheld according to the judgment of a majority of the board as to what is necessary and proper." *Daniels v. Hathaway*, 65 Vt. 247, 255, 26 A. 970, 973 (1892).

Specifically, the Town relies on 19 V.S.A. § 304 and its proviso for the safety of the public. The legislative history of this section indicates that it was added in the general recodification of the highway laws that occurred in 1986. See 1985, No. 269 (Adj. Sess.) ("An Act Relating to Re-Codification of Title 19"). As the legal counsel

to the Agency of Transportation made clear when the measure came before the Senate Highway and Traffic Committee for public hearing, the purpose of Act 269 was not to "attempt to change any of Title 19" but rather to "clean it up" and to "recodify it." Hearings on Review of Title 19 before the Senate Highways and Traffic Committee, Sept. 19, 1985, at 3 (testimony of Robert Schwartz); see also *Conn v. Middlebury Union High School District #3*, 162 Vt. 498, 502-03, 648 A.2d 1385, 1388 (1994) (we presume statutory recodification does not change the meaning derived from preexisting section). With regard to § 304, the Legislature recodified language of the 1974 law, which added 19 V.S.A. § 101, to provide: "The selectmen shall superintend the expenditure of the town highway tax, shall have charge of keeping in repair such highways and shall be responsible to the town for damages sustained by it through their fault or neglect in the discharge of their duties." 1973, No. 63, § 7, eff. July 1, 1974. This language, in turn, had been adopted as part of the change in responsibility over highway expenditures from town road commissioners to the selectboard of the town.

Rather than retaining the 1973 language, the Legislature chose language from a 1965 comprehensive study of Vermont's highway law, prepared by the Automobile Safety Foundation and entitled Modernizing Vermont's Highway Law. That report recommended the language now in § 304(a)(1) to consolidate the "substantive provisions" of a number of sections, including what was then 19 V.S.A. § 931, which required the town to "keep in good and sufficient repair at all seasons of the year its highways." See Automotive Safety Foundation, Modernizing Vermont's Highway Law 41 (1965). In fact, the 1986 recodification retained the statement of the town's general responsibility, recodifying it in 19 V.S.A. § 310(a).

We can find no antecedent for the safety proviso on which the Town relies. Apparently, the drafters of the 1965 study believed that all of the selectboard's responsibilities were subject to some requirement of public safety, but nothing in the prior law expressed such a requirement or how it would be implemented. Indeed, in *Couture*, 121 Vt. at 363, 159 A.2d at 80-81, a case involving a dispute between the selectboard and town road commissioner over control of road repair and maintenance equipment, we held that the selectboard's general supervisory power could not override specific provisions of the highway act, in that case the specific authority of the road commissioner, even when the selectboard was acting to protect the safety of town equipment.

Nor is the drafting sufficiently precise for us to obtain a plain meaning from it. Literally, the language suggests that none of the selectboard's responsibilities are operable unless "the safety of the public so requires," but such an interpretation would subject relatively specific town responsibilities to a vague and general standard and go far beyond the mere recodification that was intended.[4] Further, it would require the selectboard to act solely in one instance, when public safety requires it, ignoring the other considerations behind its duties under the highway act.

When we look at the entire statutory scheme, as we must, we believe that the Town was not entitled to dismissal of this action. In harmonizing the various statutes, we cannot accept the Town's argument that the discretionary power of the selectboard and its obligation to act to protect public safety allows it to close a class 2 road for the winter months. By its designation, the Lincoln Gap Road must meet a standard of negotiability under normal conditions all seasons of the year. In essence, the selectboard is saying that the road is unsafe in the winter and it cannot be used during that season. By this reasoning, the Lincoln Gap Road cannot meet the standards of a class 2 road and is improperly classified. That may be a reason to reclassify the road, but it is not a sufficient reason to refuse to maintain it in accordance with its current classification.

Accordingly, we cannot base our decision on the selectboard's discretion. The board has discretion in determining the means of discharging its statutory responsibility, and no doubt safety to employees and travelers must figure prominently in that determination, but it does not have discretion to refuse to exercise those responsibilities. The plaintiff has alleged a refusal to act that is properly remedied by mandamus. See *Ellis*, 113 Vt. at 516, 37 A.2d at 380.

Although this analysis suggests that plaintiff will be entitled to mandamus in this action, he failed to comply with the requirements of V.R.C.P. 56 in moving for summary judgment. As a result, our relief must be limited to reversing the grant of the Town's motion to dismiss and remanding for further proceedings. On remand, the superior

---

[4] In *Villeneuve v. Town of Essex*, 167 Vt. 618, 619, 713 A.2d 815, 816 (1998) (mem.), this Court described another section in the 1986 recodification as "ungrammatical and nonsensical as written." Although this description may overstate the weaknesses in the drafting of § 304, we believe that the drafting makes it difficult for us to discern the legislative intent.

court can also address plaintiff's appeal of the selectboard's denial of his request for an additional road cut.

*Reversed and remanded.*

**Amestoy, C.J.,** dissenting. Today's decision not only undercuts the general supervisory authority that Vermont law bestows upon local selectboards to operate and maintain town highways, but also requires the Warren Selectboard in this case to choose between plowing a road widely recognized as unsafe for winter travel or reclassifying the road as a class 4 highway even though it serves as one of the principal routes over the spine of the Green Mountains during three seasons of the year. Because I believe that Vermont law grants local selectboards discretion in how to classify and maintain town highways, and does not compel the choice imposed by the majority, I dissent.

Many Vermonters are familiar with the steep, twisting road that wends its way over Lincoln Gap between Warren and Lincoln. While serving local town residents and visitors as a scenic route over the Green Mountains for most of the year, the road becomes treacherous after the first snows fall, and thus has been closed every winter for more than fifty years.[*] Not desiring to endanger its plow operators or the driving public, and unwilling to incur the significant expense of trying to keep open a road not suitable for winter travel, the Warren Selectboard declined to plow an upper section of the road to allow plaintiff year-round access to his uninhabited land.

The majority ignores the selectboard's reasonable decision and its general supervisory authority over town highways, instead relying on scant legislative history to conclude that the Legislature intended to make it a ministerial duty for towns to plow the entire length of each and every class 2 and 3 town highway within their jurisdiction. In my judgment, the majority's opinion undermines the statutory framework that allows local selectboards, with state oversight, to make discretionary decisions over such matters.

As the majority states, plaintiff cannot prevail merely by showing that the Warren Selectboard abused its discretion. Rather, to obtain a writ of mandamus, he must demonstrate that the selectboard had no

---

[*] Contrary to the majority's statement, the record does show that the Lincoln Gap Road has not been plowed for fifty years. The minutes taken from the September 10, 1996 meeting of the Warren Selectboard reveal that the members of the board indicated that it had been the policy of the Town for fifty years not to plow the upper portion of the Lincoln Gap Road.

discretion to decide not to plow the entire length of the Lincoln Gap Road or that its failure to plow the road was an arbitrary abuse of power. Plaintiff cannot make such a showing, given the status of Vermont law. "Town highways shall be under the general supervision and control of the selectmen of the town where the roads are located." 19 V.S.A. § 303. Town selectboards "shall have the authority to . . . see that town highways and bridges are properly laid out, constructed, maintained, altered, widened, vacated, discontinued and operated, *when the safety of the public requires*, in accordance with the provisions of this title." See 19 V.S.A. § 304(a)(1) (emphasis added).

The majority disregards the underlined phrase, stating that neither its source nor meaning can be divined. But we must assume that the phrase has some meaning, and if it has any meaning at all, the enumerated statutory duties cannot be characterized as ministerial in nature. Even absent the underlined phrase, the cited provisions grant authority and impose duties that, by their very nature, require discretionary decisions. Certainly, the provisions do not encompass the type of ministerial duties that could be compelled by mandamus. See *Vermont State Employees' Ass'n v. Vermont Criminal Justice Training Council*, 167 Vt. 191, 195, 704 A.2d 769, 771 (1997) (purpose of mandamus is to require public officer or body to perform simple and definite ministerial task, and thus ordinarily is not available to compel discretionary decisions). Rather than being sensitive to, and minimizing any encroachment on, the broad authority that the Legislature has given to local selectboards over town roads, see *Hansen v. Town of Charleston*, 157 Vt. 329, 335, 597 A.2d 321, 324 (1991), the majority acknowledges the discretion of selectboards to determine the means of discharging their statutory duties, but then prohibits the Warren Selectboard's exercise of that discretion by characterizing the selectboard's choice of means as a refusal to exercise responsibility.

In seeking a writ of mandamus, plaintiff relies primarily on statutory provisions requiring towns to "keep its class 1, 2 and 3 highways and bridges in good and sufficient repair during all seasons of the year," 19 V.S.A. § 310(a), and setting minimum standards for class 3 highways, including that they be "negotiable under normal conditions all seasons of the year by a standard manufactured pleasure car" and have "sufficient width capable to provide winter maintenance." See 19 V.S.A. § 302(a)(3)(B). As the majority points out, however, these statutes are ambiguous with respect to the issue

before us — whether all sections of roads designated as class 2 town highways must be plowed through the winter. The majority's opinion also correctly notes, in attempting to resolve this ambiguity by reviewing the history of state funding statutes, that historically towns could decide not to plow state aid highways notwithstanding their obligation to keep such highways in good repair during all seasons of the year. As the majority states, the Legislature apparently accepted the notion that a highway could be in good repair even if its full length was not plowed through the winter.

I agree with the majority's analysis up to this point. But I am not persuaded that a single phrase in a brief comment made by one legislator at a public hearing on the 1973 act establishing the road classification system demonstrates that the Legislature intended to require towns henceforth to plow the full length of every class 2 and 3 town highway. If anything, the legislative history relied upon by the majority demonstrates precisely the opposite — that the Legislature intended no such "fundamental change." 170 Vt. at 173, 744 A.2d at 427.

The transcript of the January 25, 1973 hearing that the majority relies upon reveals that the Commission on an Integrated Highway System sought to prevent towns from obtaining state funds for "maintaining" many miles of obviously untraveled and impassable "roads" claimed as town highways. See Hearing on S. 37 and H. 132 before the Senate Highways and Bridges Committee and the House Highways Committee, January 25, 1973, at 3. The Commission discussed and *rejected* various proposals for addressing the problem, including "a provision that state aid be allowed only for highways that are plowed and thus usable for 12 months of the year." *Id.* Ultimately, as the majority notes, the Commission was persuaded that the simplest and most effective solution would be to require the involvement of state officials in the certification of eligible roads. See *id.* at 4.

During the hearing, in response to the statement of the bill's sponsor that people will have to decide which town roads "are to be accepted as traveled roads," Senator O'Brien, the chairman of the Senate Highways and Bridges Committee, made the following comments:

> Excuse me just a moment, I wonder if everybody here understands just what you mean by this; they're going to lose money on these roads that are not even traveled.
>
> . . . .

> Heretofore, you know that some of the towns have been asking and receiving money for roads that are not passable, not even with a jeep. That has got to be cut out; they're not roads at all, you know. And the towns that are getting the money, some other town is losing money. So unless we give the money to the town that if their roads are passable year round.

*Id.*

The majority construes these comments, specifically the last three words of the nonsensical final sentence, as demonstrating that the Legislature intended the "fundamental change" of conditioning state funding on towns plowing town highways and thus keeping them "passable year round." 170 Vt. at 173, 744 A.2d at 427. In my view, the comments merely reflect the Committee's concern over towns claiming state funds for impassable byways that were not really roads at all. The comments cannot reasonably be construed to suggest an intent to require the plowing of town highways or to alter the previous understanding that the statutory duty to repair is independent of any duty to plow. Indeed, as noted, the Commission explicitly rejected a proposal that would have conditioned state funding on towns plowing town highways.

In short, the majority's analysis of the legislative history of 19 V.S.A. § 302 does not support its decision. Nor is the majority's decision supported by its examination of the history of 19 V.S.A. § 310, the statute requiring towns to keep roads in good repair during all seasons. Citing three mid-nineteenth century cases in which towns were sued for damages for not keeping roads in good repair, the majority concludes that the duty to "repair" has historically been viewed broadly enough to include the duty to remove snow to keep roads passable in the winter. See 170 Vt. at 174-75, 744 A.2d at 428. This conclusion conflicts with the majority's earlier acknowledgement that historically the statutory duty of towns to keep roads in good repair was independent of any duty to plow the roads.

The majority suggests that if towns are unwilling or unable to fulfill their ministerial duty to plow the entire length of every class 2 and 3 town highway, then they must reclassify the unplowed roads as class 4 highways. This reasoning fails to take into account the current statutory scheme, which gives towns the discretion to supervise and control the classification and maintenance of their town highways, subject to state review. "The selectmen, with the approval of the agency, shall determine which highways are to be class 2 highways."

19 V.S.A. § 302(a)(2). On an annual basis, town selectboards are required to report to the agency of transportation their plans for the maintenance and construction of all highways under their control. See 19 V.S.A. § 306(j). "[A] representative of the agency may measure and inspect the class 1, 2 and 3 town highways in each town to verify the accuracy of the records on file with the agency." 19 V.S.A. § 305(a). If any highway or portion of a highway does not meet the standards for its assigned class, the agency must notify the town, which then has one year either to reclassify the road or restore the highway or portion of the highway to the accepted standard. See *id.* If the town fails to do so, the agency "shall deduct the affected mileage from that assigned to the town for the particular class of the road in question." *Id.*

The Lincoln Gap Road has been closed during the winter every year for more than fifty years. Even assuming the Town of Warren were willing and able to incur the significant expense of keeping it plowed, the road is apparently too treacherous in the winter to be kept open. Yet, during most of the year, the road is a primary route over the spine of the Green Mountains. Given these circumstances, the Warren Selectboard has reasonably exercised its discretion in designating the road as a class 2 highway. Presumably, the agency of transportation is aware of, and has approved, the Town's designation of the Lincoln Gap Road as a class 2 highway, knowing that the upper section of the road is closed in the winter. If closing the upper portion of the Lincoln Gap Road in the winter so obviously undermines the class 2 "standard of negotiability," 170 Vt. at 177, 744 A.2d at 430, why has the state apparently allowed the road's class 2 designation to stand, notwithstanding its statutory right to object?

The answer is obvious. Rather than requiring towns, as a ministerial act, to plow every foot of every class 2 and 3 highway under their jurisdiction, the Legislature has given local selectboards discretionary control over the classification and maintenance of their town highways, but has made that control subject to the state's right to intervene and withhold state funds when the selectboards abuse the discretion bestowed upon them. Because the Town acted reasonably in this case, the state apparently chose not to intervene.

Today's decision implies that if any section of any road is closed in the winter for safety or other reasons, that road can be designated only as a class 4 highway. A quick scan of Vermont's official state map reveals the existence of several class 2 and 3 town highways that are closed in the winter. The Kelley Stand Road between Stratton and

Arlington and the Hazens Notch Road between Montgomery and Lowell are two examples of class 2 highways that are closed in the winter. I have no doubt that these roads, like the Lincoln Gap Road and Smuggler's Notch, are closed for good reason, most likely to protect the driving public. I do not believe that towns should be faced with the choice of either plowing the entire length of every class 2 and 3 highway, or designating those roads as class 4 highways even when their use in seasons other than winter supports a class 2 or 3 designation. More importantly, I do not believe that the Legislature intended such a result.

The majority notes that the dispute that instigated the instant action concerned a portion of the Lincoln Gap Road that had previously been plowed. But, as the majority acknowledges, the posture of the case has resulted in a general pronouncement on the duty of towns to plow class 2 and 3 highways. I am concerned with the scope of the majority's holding, not the scope of the initial dispute that led to that holding. Accordingly, I dissent.